# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

EDWARD CHALMERS,

        Plaintiff,

        v.

THE CITY OF CHICAGO, MATTHEW
PUFPAF, WILLIAM ROBLES, and PHILLIP
SCHORSCH,

        Defendants.

No. 21 CV 1531

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Chicago Police Officers Pufpaf, Robles, and Schorsch arrested Edward Chalmers because they suspected he had been dealing drugs. During the arrest, the officers put their hands on and around Chalmers's neck and face, and, as the arrest proceeded, Officer Pufpaf punched Chalmers in the face and kneed him in the back. Chalmers brought claims for excessive force, conspiracy, and false arrest under 42 U.S.C. § 1983 and state-law claims of malicious prosecution, intentional infliction of emotional distress, and battery. Both sides move for summary judgment: defendants' motion is granted in part, denied in part and plaintiff's motion is denied.

## I. Legal Standards

Summary judgment is warranted when the movant shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the non-

moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party can also show that the non-moving party has failed to establish an essential element of his case and could not carry his burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In reviewing "cross-motions for summary judgment, all facts and inferences are drawn in the light most favorable to the non-moving party on each motion." *Birch Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The court can "consider evidence submitted in response to one motion when it decide[s] the other." *Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019).

## II.   Facts

### A.   The Police Surveillance

Officers Matthew Pufpaf, William Robles, and Phillip Schorsch were the enforcement team during an August 3, 2020 operation on the west side of Chicago. [51] ¶¶ 2, 5.[1] The intersection of Springfield and Monroe was an "area of interest"

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiff's response to defendants' Local Rule 56.1 statement of facts, [51], plaintiff's reply to defendants' response to plaintiff's Local Rule 56.1 statement of facts, [59], and plaintiff's response to defendant's Local Rule 56.1 statement of additional facts, [61], where both the asserted fact and the response are set forth in one document. Local Rule 56.1 does not allow replies and plaintiff did not seek permission to file the reply. However, because the paragraph numbering in defendants' response, [46], contains an error, I cite to plaintiff's reply, [59], but strike and do not consider any of plaintiff's proffered replies to defendants' responses to the facts. I disregard arguments and facts that are irrelevant to the legal issues at stake, particularly those facts that the officers did not know at the time they encountered Chalmers. *See* [51] ¶¶ 9, 11, 57, 59. Citations to redundant facts have been omitted. *See* [51] ¶¶ 13, 17, 25, 26, 37, 41, 48; [61] ¶¶ 1, 5, 7, 16, 19, 24, 38. Finally, some statements were not supported by the cited material and those facts are omitted. *See* [51] ¶¶ 10, 16. Chalmers objects to some of defendants' facts on the basis that the attached exhibits had formatting issues that prevent him from confirming the cites are correct. *See for example* [51] ¶ 6; [61]

because there "was a high volume of narcotics sales in that area." [58-1] at 31:7–16; [51] ¶¶ 5, 8.[2] The operation consisted of a surveillance team, both on the ground and monitoring a police observation device (POD camera), and the enforcement team. [51] ¶ 6.[3] The surveillance team notified Pufpaf, Robles, and Schorsch of a suspected narcotics sale and described the suspected buyer and seller. [51] ¶¶ 12, 14.[4] The surveillance team described the suspected seller by his clothing and the use of a small motorbike or dirt bike. [51] ¶ 15.

The POD video monitored by the surveillance team shows three men waiting on a corner, two are sitting and one is standing; a red and white motorbike is parked to the side. [40] (POD video at 20:36–20:39; 20:42–20:53).[5] A man in a white t-shirt

---

[2] Defendants filed corrected versions to the docket, [58-1] and [58-2], and I have confirmed that the cited material supports the statements in ¶¶ 5, 6, 8, 12, 14, 15, 18, 19, 21, 22, 23, 24, 27, 29, 30, 31, 33, 38, 40, 42 of defendants' statement of facts, [51], and ¶¶ 2, 3, 9, 18, 22 of defendants' statement of additional facts, [61].

[2] Chalmers objects to this paragraph on the basis that it is irrelevant. [51] ¶ 8. I disagree; the reason the officers were conducting an operation in the area is relevant to the issue of probable cause for Chalmers's arrest.

[3] Chalmers objects to ¶ 6 of defendants' statement of facts on the basis that it is irrelevant. [51] ¶ 6. Facts about how the officers' operation was structured goes to what information the officers and their agency knew, how they learned it, and how they communicated it, all of which is relevant to the issue of probable cause for Chalmers's arrest.

[4] Chalmers objects multiple times to the use of "narcotics sales" and the use of "seller" or "buyer" in defendants' statement of facts. Chalmers bases his dispute on the fact that the POD video, the cited portion of the record, does not show a transaction. *See* [51] ¶¶ 12, 14, 15, 16, 17, 20, 22, 23, 24, 25, 26. The POD video shows an interaction, but does not depict an exchange of drugs for money between Chalmers and the man in the white t-shirt. I use "suspected" to modify the fact of, and parties to, any alleged drug deal.

[5] Links to defendants' digital exhibits are available as follows: the POD video is the fourth link listed at [40]; footage from Pufpaf's body-worn camera, depicting the arrest of Chalmers, is the first link listed at [40]; footage from Pufpaf's body-worn camera, depicting the arrest of the suspected buyer, is the third link listed at [40]; footage from Schorsch's body-worn camera, depicting the arrest of Chalmers, is the second link listed at [40]; the recording of a phone call made from Cook County Jail by Chalmers to a family member is the first link listed at [49]. Plaintiff also attached the videos from Schorsch and Pufpaf's body-worn

with a lanyard around his neck walks up to the corner. [40] (POD video at 20:54–21:02). The camera cuts away, and when it returns to the corner, it shows only two men waiting on the corner, a third man walking by them, and the red and white motorbike parked to the side. [40] (POD video at 21:26-21:30). The camera then follows two men walking down the sidewalk, one appears to be the man in the white t-shirt who was walking up to the corner and the other is taller in a dark t-shirt. [40] (POD video at 21:30–21:35). The camera tracks up to the trees and comes back down to show the two men walking away from another—the one in white continuing to walk away from the corner and the man in the dark t-shirt, which has neon shapes on it, walking back toward the corner. [40] (POD video at 21:35–21:45).

The camera follows the man in the dark t-shirt walking down the sidewalk, coming to the red and white motorbike, putting his hand on the handle and lifting the kickstand. [40] (POD video at 21:51–22:23). The camera cuts away again, eventually following the man in the white t-shirt who is continuing to walk on the sidewalk away from the corner until he leaves the frame. [40] (POD video at 22:37–21:33). The camera returns to the street corner where the same three men are standing or sitting; they appear to chat amongst themselves and interact with passers-by. [40] (POD video at 24:24–25:51). Then the man in the dark t-shirt and jeans gets on his motorbike and drives off in the opposite direction that the man in white had been walking. [40] (POD video at 25:51–25:59).

---

cameras as the first and second links respectively at [42]; a slowed down version of Schorsch's body-worn video is the third link at [42].

Pufpaf, Robles, and Schorsch were first directed to the suspected buyer, who was on a CTA bus going north on Pulaski; they boarded the bus at Pulaski and Lake. [51] ¶¶ 18, 19. The suspected buyer handed over two small bags of suspected drugs and was placed under arrest. [51] ¶ 21. The video of the arrest of the suspected buyer shows a man in a white t-shirt and jeans with a lanyard around his neck, just like the man who was walking with the man in the black t-shirt on the POD video . *See* [40] (Pufpaf BWC of suspected buyer at 08:56:32–9:03:30). The man in the white t-shirt says he purchased the drugs from three guys sitting on the corner and tells them that he did not see a motorbike. [40] (Pufpaf BWC of suspected buyer at 08:59:03–08:59:11). The officers sent the suspected buyer to a police station in a different car. [40] (Pufpaf BWC of suspected buyer at 09:03:04–09:03:30). Pufpaf, Robles, and Schrosch were then directed back to the intersection of Springfield and Monroe by someone on the surveillance team who had a visual of the suspected seller. [51] ¶ 22. The surveillance team also told the officers that the suspected seller was on a motorbike and had previously given the officers a description of the suspected seller's clothing. [51] ¶¶ 15, 23–24.[6]

## B.    Following Chalmers

Pufpaf, Robles, and Schorsch drove back to the area of Springfield and Monroe and came upon plaintiff Edward Chalmers on a motorbike driving west on Monroe. [61] ¶ 2; [51] ¶ 7; [59] ¶ 3. When the officers reached the corner, individuals in the

---

[6] Chalmers does not deny that he is depicted in the POD video but contends that the video does not show a transaction between him and the man in the white t-shirt with a lanyard around his neck. [51] ¶ 61.

area yelled "12," "lights," "it's real," or something to that effect to alert others to the presence of the police. [51] ¶ 27.[7] Pufpaf saw Chalmers look back in his direction and continue riding westbound on Monroe. [51] ¶ 28. Chalmers drove west through the intersection between Monroe and Pulaski and made a left turn on Karlov. [51] ¶¶ 29, 32.[8] The officers drove without lights or sirens and once they came to the intersection of Karlov and Monroe, they could see Chalmers standing in the street with his motorbike on its side. [37-3] at 39:1–11; [51] ¶ 33.

Chalmers states that he pulled over and got off his bike when he realized that the officers were following him. [59] ¶ 4; [35-1] at 54:19–55:20. The officers contend that Chalmers had fallen off his bike, relying on the medical notes from the provider who later treated him. [61] ¶ 4.[9] The officers also describe Chalmers as looking back

---

[7] Chalmers objects to this paragraph because he believes it to be irrelevant to defendants' motion for summary judgment. [51] ¶ 27. Whether or not Chalmers was on notice that there were police in the area is relevant to whether it is credible to find that he was fleeing the police, a disputed and relevant fact for determining the reasonableness of the officers' force.

[8] Chalmers objects to ¶ 32 of defendants' statement of facts because one of the cites does not support the facts in the paragraph. [51] ¶ 32. The first cite, [37-3] at 49:1–11, does support the fact that Pufpaf saw Chalmers make a left turn on Karlov.

[9] Chalmers objects to ¶ 4 of defendants' statement of additional facts on the basis that the nurse practitioner had no independent recollection of the event and read from her medical notes. [61] ¶ 4. The statement that Chalmers made to the nurse is admissible as either a statement of a party opponent or a statement made for medical diagnosis or treatment. Fed. R. Evid. 801(d)(2) or 803(4). Chalmers does not dispute that the notes the nurse read from during the deposition are part of medical records admissible under Rule 803(6). The notes state: "39-year-old male brought by Chicago Police Department for swallowing a bag of cocaine and heroin. Patient initially stated he did not ingest, then stated he did if Chicago Police Department says he did. He also has right wrist and left ankle pain. States his motorbike hit a curb and he fell off. Falls on an outstretched hand." [46-1] at 20:8–14. The phrasing, "Patient initially stated," "then stated," "states his" indicate that the nurse practitioner was taking notes based on what Chalmers told her. Finally, she later testified that when she relied on a source other than the patient to create notes, she would document that. [46-1] at 20:19–21:14. This evidence is relevant and admissible.

at them and then "speeding off" on his motorbike and running the stop sign at Monroe and Pulaski. [61] ¶ 3. The officers say they were not going to follow him through the intersection and were ready to go back to the station until Pufpaf saw Chalmers turn left on Karlov. [51] ¶¶ 30–33.[10]

### C.    Initial Encounter

The parties diverge in their accounts of what happened during their subsequent interaction. Pufpaf says that when he first saw Chalmers on Karlov, he saw Chalmers "motioning from his waistband to his mouth." [37-3] at 39:7–11; [61] ¶ 6. In Pufpaf's experience, people who are selling drugs will often swallow the drugs to destroy evidence. [51] ¶ 34. As he got out of the squad car, Pufpaf saw Chalmers either chewing or swallowing something. [51] ¶ 35. Pufpaf believed that Chalmers had something in his mouth, but Chalmers denies that he had anything in his mouth. [61] ¶ 10; [51] ¶ 36. Chalmers says that he did not put drugs in his mouth after he stopped the bike. [51] ¶ 36.

The parties agree that as the officers were exiting their car, Chalmers did not attempt to flee, was compliant, and did not pose a threat to the officers' safety. [59] ¶ 6; [51] ¶ 38. Plaintiff put his hands in the air and waited for the officers. [59] ¶ 5. Robles was the first officer to make physical contact with Chalmers and he began to cuff Chalmers's left wrist. [61] ¶ 9. Pufpaf's body-worn video shows the officers

---

[10] Chalmers objects to ¶¶ 30 and 31 of defendants' statement of facts on the basis that they are irrelevant. [51] ¶¶ 30–31. Whether Chalmers was driving away from the police because he did not know they wanted to stop him or because he wanted to evade them is relevant to whether he attempted to flee, one of the factors to consider when determining whether the officers used reasonable force in seizing him.

getting out of the car at about 09:08:22 and a flash of Robles making contact with Chalmers at about 09:08:25; because of the position of the lens, the video does not depict Chalmers until after the moment Pufpaf claims to have seen Chalmers gesture to his mouth. [40] (Pufpaf BWC of the Chalmers arrest at 09:08:22–09:08:25). While Robles was cuffing Chalmers's left wrist, Chalmers did not attempt to flee, resist, strike any officer, or defeat the arrest. [59] ¶ 7; [51] ¶ 39. Before Pufpaf made physical contact with Chalmers, he was not a threat to the officers and had not resisted arrest. [59] ¶ 9. Chalmers had not taken any aggressive moves to prevent the officers from taking him into custody. [59] ¶ 12. Robles was able to get handcuffs on Chalmers's left wrist and to put his left wrist behind his back. [35-4] at 49:14–50:25.

### D. Use of Force

Pufpaf was the second officer to put hands on Chalmers, and the parties agree that he made contact with the back of Chalmers's neck with one of his hands. [59] ¶ 8. Chalmers states that Pufpaf choked him by applying pressure to the front of Chalmers's neck and that he struggled to breathe. [59] ¶¶ 8, 10. Pufpaf says that his hand started on Chalmers's jawline and when Chalmers jolted his head back, it caused Pufpaf to lose grasp of Chalmers's jawline and make contact with the front of Chalmers's neck. [37-3] at 46:2–17; [61] ¶ 21. Pufpaf denies that he ever applied pressure to the front of Chalmers's neck so as to cut off an airway or did anything to stop Chalmers from breathing. [37-3] at 48:15–17; [61] ¶ 20; [51] ¶ 45.

Pufpaf ordered Plaintiff to "spit it out," and he yelled that phrase repeatedly during the encounter. [51] ¶ 40; [61] ¶ 15. Chalmers states that Pufpaf only told him

to "spit it out" *after* Pufpaf had already grabbed his neck and began choking him. [51] ¶ 40; [59] ¶ 28. The body-worn videos do not have audio at the beginning of the encounter, so they are not conclusive as to whether Pufpaf gave a verbal direction before he touched Chalmers. Pufpaf's video has audio starting at 09:08:30, but all one can hear is muffled sounds until 09:08:31, when Pufpaf says, "It's still in your mouth, spit it the fuck out." [40] (Pufpaf BWC of the Chalmers arrest at 09:06:30–09:08:31). The camera does not show Chalmers's face at that point, so while the angle of Pufpaf's arm suggests that he is making contact with Chalmers's neck, it does not show what Pufpaf's hands are doing. [40] (Pufpaf BWC of the Chalmers arrest at 09:08:31). Chalmers stated several times during the encounter, "I have nothing." [59] ¶ 28. Because of the lack of audio at the beginning of the video, it is not clear when Chalmers first denied that he had drugs. Schorsch's video does not have audio until 09:09:04, well after the first physical contact between Chalmers and the officers; the first time one can hear Chalmers saying "I have nothing" on Schorsch's video is at 09:09:09. [40] (Schorsch BWC at 09:07:05–09:09:09).

Chalmers states that while Pufpaf had his hands on his neck, Robles pinched his nose and cut off his airway. [59] ¶ 11. Robles says that he touched Chalmers's face but did not pinch his nose. [51] ¶ 46. Pufpaf says that Chalmers was not complying with his verbal command to spit out the drugs he suspected were in Chalmers's mouth and that he was concerned that Chalmers would suffer a fatal overdose from ingesting narcotics. [51] ¶ 42; [61] ¶¶ 11–12; [59] ¶¶ 22, 27. After about 20 seconds, the officers and Chalmers end up against the officers' car. [40] (Schorsch BWC at

09:08:46) (counting time from when Robles first touched Chalmers at approximately 09:08:25 on Pufpaf's video). The officers contend it was a technique to get Chalmers into custody because he was not compliant with their verbal requests and that while he was up against the car, Chalmers was resisting arrest by pushing away with his body. [61] ¶¶ 17–18, 22.

Pufpaf and Robles then took Chalmers to the ground. [61] ¶ 14; [59] ¶ 14. Pufpaf says that before they took Chalmers to the ground, Chalmers struck Pufpaf with his elbow above his vest. [61] ¶ 23; [51] ¶ 49. Pufpaf also states that Chalmers hit him another time in the vest, although it is not clear whether that strike occurred while the parties were upright or on the ground. [51] ¶ 54; [61] ¶ 31. Chalmers says that before being taken to the ground, he had not hit or struck any officer. [59] ¶ 18. The video footage does not resolve this factual dispute—Schorsch's body-worn camera is the only one that is still recording at that point and it does not show Chalmers hitting anyone, however Pufpaf's body was often between Schorsch (and the camera) and Chalmers. [59] ¶ 15; [61] ¶ 31.

As Pufpaf and Robles were taking Chalmers to the ground, Pufpaf punched Chalmers in the face twice. [59] ¶ 16; [61] ¶¶ 26–27. Pufpaf contends that he administered the punches "to overcome aggression, in response to the battery, and to defend himself and fellow officers." [51] ¶ 55; [37-3] at 73:6–74:1. The parties agree that at the time Chalmers was taken to the ground Robles had control of Chalmers's left wrist in a handcuff, but disagree about whether Schorsch had control of Chalmers's right arm. [59] ¶ 17.

10

Once on the ground, Pufpaf was on Chalmers's back and Robles had control of Chalmers's left hand. [59] ¶ 19. The parties dispute if and when Schorsch had control of Chalmers's right hand. [59] ¶ 19; [61] ¶ 30. While Chalmers was on the ground, Pufpaf delivered two knee strikes. [59] ¶ 20; [61] ¶ 29; [51] ¶ 56. The parties dispute where the knee strike hit Chalmers—Chalmers states the knee strikes were to his back and Pufpaf says they were to Chalmers's thigh. [59] ¶ 20; [61] ¶ 29. The officers contend that before Pufpaf gave the knee strikes Chalmers was trying to "buck people off" and defeat the arrest. [61] ¶ 32. Pufpaf also claims that Chalmers was "arching his back" and that Pufpaf was concerned that Chalmers could have been trying to access a firearm contained in his waistband. [61] ¶ 33; [47-1] at 87:9–16. Pufpaf testified that people who deal drugs often carry firearms. [61] ¶ 8.[11] The video shows Pufpaf on top of Chalmers, from about the time they reach the ground at 09:08:56 until about 09:09:30. [40] (Schorsch BWC at 09:08:56–09:09:30). Schorsch, whose body-worn camera is the only one still recording at this point, is clearly holding Chalmers's right hand by 09:09:15. *Id.* Most of the video is a close-up of Pufpaf's back, so the video does not show Chalmers struggling or resisting. *Id.* at 09:08:54–09:09:29. At 09:09:31 Schorsch gives Chalmer's left hand to Pufpaf, who is still exerting force onto the back of Chalmers's neck. *Id.* at 09:09:31. Chalmers says that in addition to

---

[11] Chalmers objects to ¶ 8 of defendant's statement of additional facts on the basis that it is a mischaracterization of Pufpaf's testimony and that it is misleading in that it suggests that he was armed. [61] ¶ 8. Pufpaf testified that in his experience people who deal drugs often carry a firearm. [47-1] at 87:9–16. That testimony is relevant to an officer's risk assessment when struggling with a suspect, but the credibility and weight of that testimony cannot be resolved at summary judgment.

Pufpaf choking him, punching and telling him to spit it out and Robles holding his nose closed, Schorsch was standing on his leg. [51] ¶ 44.

Chalmers does not recall resisting, but insists that he did not punch, elbow, or kick anyone during the encounter. [51] ¶ 43.[12] There is no body-worn video that shows Chalmers hitting or striking officers. [59] ¶ 15.[13] The officers contend that is because Pufpaf's body was in the way of Schorsch's body-worn camera. [61] ¶ 23. And this is the central disagreement—the parties do not agree whether Chalmers ever resisted arrest and, thus at what point he was under the officers' control. The officers say that Chalmers disobeyed their verbal commands to spit out drugs, resisted handcuffing, struck Pufpaf, and was not in control until after Pufpaf delivered the knee strikes. *See* [51] ¶¶ 48, 50–53; [61] ¶¶ 13, 22, 25, 28, 32. Chalmers states that he was compliant with the officers' commands (impliedly, he couldn't spit out drugs that weren't in his mouth) and that he was under the officers' control at least from the time that Pufpaf began choking him, and certainly by the time he was on the ground. [59] ¶¶ 16–20.

---

[12] Chalmers objects to ¶ 43 of defendants' statement of facts on the basis that it mischaracterizes Chalmers's testimony about the whole encounter with the officers as being about one point in time. [51] ¶ 43. The cited portion of the deposition transcript is: "Q: Did you resist at all? A: Don't recall. Q: Did you punch anybody? A: No, sir. Q: Did you elbow anybody. A: No, sir. Q: Did you kick anybody? A: No, sir." [37-2] at 64:15–22. The cited portion of the record supports the statement above and I overrule the objection.

[13] Defendants submit a recording of an alleged jailhouse call he made to his aunt in which he said that he fought the officers. [61] ¶ 36; [49] (CCDOC call at 2:00–2:30). Chalmers says that the call is "rife with statements that contradict both parties' versions of events." [61] ¶ 36. Chalmers does not object on lack of foundation for the call, and the question of Chalmers's credibility is an issue of fact that a jury would determine.

Eventually the officers put handcuffs on both of Chalmers's wrists. [51] ¶ 58. After his arrest, Chalmers was taken to the hospital. [61] ¶ 37. An x-ray of Chalmers's abdomen did not show any foreign bodies. [59] ¶ 29; [61] ¶ 37. The nurse practitioner who provided care to Chalmers at the hospital prepared notes that reflected the following history: "39-year-old male brought by Chicago Police Department for swallowing a bag of cocaine and heroin. Patient initially stated he did not ingest, then stated he did if Chicago Police Department says he did. He also has right wrist and left ankle pain. States his motorbike hit a curb and he fell off. Falls on an outstretched hand." [61] ¶ 39; [47-4] at 20:8–18. The nurse practitioner did not note complaints of head or neck injury. [61] ¶ 40. Chalmers was diagnosed with a left ankle fracture and right wrist fracture. [47-4] at 30:14–22. Chalmers also had bruises on his face and had to have several surgeries on his arm. [59] ¶ 30.

The officers signed criminal complaints against Chalmers—Schorsch signed two felony complaints for delivery of a controlled substance within 500 feet of a school; Pufpaf signed two misdemeanor complaints for battery and resisting arrest; Robles signed a misdemeanor complaint for resisting arrest. [51] ¶ 62. All charges were *nolle prosequi* on August 19, 2020. [51] ¶ 63. Chalmers filed this case in March 2021, asserting that the officers violated his constitutional rights by using excessive force, falsely arresting him, and conspiracy to do the same and that they committed Illinois common law torts of intentional infliction of emotional distress, malicious prosecution, and battery. [59] ¶ 1; [51] ¶¶ 65–66. Chalmers also seeks indemnification from the City of Chicago. [51] ¶ 66.

13

### III.    Analysis

### A.    Excessive Force

The Fourth Amendment "guarantees citizens the right to be secure in their persons … against unreasonable ... seizures of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). To determine what constitutes a "reasonable seizure" a reviewing court must examine the totality of the circumstances "from the perspective of a reasonable officer on the scene" paying "careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. This is an objective analysis, where the court must "balanc[e] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* An officer's subjective beliefs and motivations are irrelevant. *Horton v. Pobjecky*, 883 F.3d 941, 950 (7th Cir. 2018). A reviewing court can look at each discrete use of force to see if it is justified by the circumstances. *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018).

Another, related issue here is the question of the officers' qualified immunity for the use of force. Government actors performing discretionary functions are immune from any suit for damages so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). There is, therefore, a two-step analysis—whether the defendants violated a plaintiff's constitutional right, and

14

whether defendants should have known that they were violating plaintiff's constitutional rights when they acted. *Abbott*, 705 F.3d at 713. A reviewing court may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When a defendant has invoked qualified immunity, a plaintiff "bears the burden of defeating it either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24 (internal citation omitted). For a right to be "clearly established," "the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). To determine whether a right is clearly established, a court should look to "controlling precedent from both the Supreme Court and this circuit, and if there is no such precedent we cast a wider net and examine all relevant case law to determine whether there was such a clear trend in the case law that we can say with a fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott*, 705 F.3d at 731.

Both parties bring motions for summary judgment on the excessive force claim, but disputed questions of material fact prevent the entry of summary judgment.

1.    *Pufpaf's Use of Force*

Chalmers alleges that Pufpaf used excessive force against him in three ways: by choking him, by twice punching him in the face, and by giving two knee strikes to his back. [36] at 4. It is undisputed that the officers were seeking to arrest Chalmers for drug-dealing, a felony that while not directly violent carries risks.[14] Although Pufpaf states that people who deal drugs often carry a firearm, there is no indication in the record that Chalmers in any way threatened or suggested to the officers that he was armed. The parties dispute whether Chalmers had been trying to flee before they arrested him, although it is undisputed that at some point he stopped and waited for them to apprehend him. At the moment of contact with the police, Chalmers was not fleeing or seeking to avoid arrest. Finally, it is disputed whether Chalmers was resisting arrest. The officers contend that Chalmers was first compliant and then resisted being put into handcuffs and battered Pufpaf. [38] at 6. Chalmers argues that he was always compliant with the officers and any perceived resistance was a reaction to the officers cutting off his airway and using force against him. [52] at 6.

a.    Choking

Courts have found it to be reasonable to use some degree of force, such as a Taser, pepper spray, knee strikes, strikes to the head, to prevent an arrestee or pre-trial detainee from ingesting drugs. *See Love v. Rockford Illinois Mun. Police Dept.*,

---

[14] "Drug dealing is a crime infused with violence." *United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) (quoting *United States v. Gambrell*, 178 F.3d 927, 929 (7th Cir.1999).

No. 08-50254, 2013 WL 159246 (N.D. Ill. Jan. 15, 2013) (taser and strikes to the mouth are reasonable); *Singleton v. City of Newburg*, 1 F.Supp.2d 306, 315 (S.D.N.Y. 1998) (Heimlich and pepper spray); *Smith v. City of Huntsville*, No. 14-cv-555-AKK, 2016 WL 5746216 (N.D. Ala. Sep. 30, 2016) (reasonable to use fingers to reach into mouth, use end of flashlight to keep mouth open and attempt to retrieve drugs with a glitter pen); *Morris v. Tulsa Police Dept.*, No. 09-CV-797-JHP-TLW, 2011 WL 1542920 (N.D. Okla. Apr. 21, 2011) (pepper spray and taser); *Robinson v. Jackson*, No. 18-cv-6814-HSG, 2020 WL 5877672 (N.D. Cal. Oct. 2, 2020) (fingers and thumb on either side of plaintiff's head under the rear of his jaw); *Becerril v. Kidd*, 972 F.2d 1337 (Table), 1992 WL 207930 (9th Cir. Aug. 27, 1992) (strikes to the head reasonable to remove syringe from arrestee's mouth). There is a limit, however, to the amount of force an officer can use to prevent a suspect from ingesting drugs; the Eleventh Circuit held it was a constitutional violation for deputies to grab a handcuffed arrestee's mouth who was not answering their questions because he had drugs in his mouth, slam him into the ground, beat him in the back with a flashlight, grind his face into the ground, pepper spray him, and force a metal object into his mouth. *King v. Reap*, 269 Fed. App'x 857 (11th Cir. 2008) (using *Saucier* articulation of qualified immunity standard).

The degree of force is disputed here but taking the facts in the light most favorable to Chalmers, Pufpaf put his hand on the front and back of Chalmers's neck and applied pressure before he gave verbal instructions to spit out narcotics. Chalmers denied that he had narcotics, and Pufpaf continued to apply pressure.

17

Given that constriction of the airway can have quick and severe consequences, it is an unreasonable use of force to constrict the airway to prevent ingestion of drugs, before giving a verbal command or taking other action to prevent the ingestion and where the arrestee is not actively resisting, evading arrest, or otherwise threatening the safety of the officers. *See Surratt v. McClaran*, 234 F.Supp.3d 815 (E.D. Tex. Mar. 3, 2016) (constitutional violation to apply force that affects arrestee's breathing because officer believes arrestee is hiding something in her mouth, unless officer gives time to elicit voluntary release of the item; rule was not clearly established so qualified immunity applies); *Singleton v. City of Newburg*, 1 F.Supp.2d 306 (S.D.N.Y. 1998) (denying summary judgment on excessive force claim against officer who may have applied pressure to front of suspect's neck when he had cocaine in his mouth; other uses of force including Heimlich maneuver and pepper spray were reasonable in the circumstances); *State v. Hodson*, 907 P.2d 1155, 1159 (Utah 1995) (per se rule that officers should not constrict a suspect's throat to prevent them from swallowing drugs); *Neal v. Bierbaum*, No. 17-1495, 2018 WL 6268198 (C.D. Ill. Nov. 30, 2018) (unreasonable use of force to strike arrestee in the mouth before giving verbal command to spit out suspected drugs, but finding it is not a clearly established rule); *but see Espinoza v. United States*, 278 F.2d 802, 804 (5th Cir. 1960) (constitutional for an officer to hold a suspect's throat and pry open their mouth in order to prevent the suspect from ingesting narcotics), *accord German v. Sosa*, 399 Fed. App'x 554, 556 (11th Cir. 2010); *Johnson v. Rogers*, No. 3:10-CV-50-WKW, 2012 WL 3231327 (M.D. Ala. July 11, 2012) (reasonable to use chokehold to prevent arrestee from

18

swallowing crack cocaine); *Ellis v. Columbus Police Department*, No. 1:07CV124-A-A, 2009 WL 1663454 (N.D. Miss. June 15, 2009) (holding throat and pinching nose shut). Summary judgment is therefore not appropriate for the defendants on the basis that there was, as a matter of law, no constitutional violation. The next step is to determine whether Pufpaf's actions are protected by qualified immunity.

Restricting an individual's airway is a kind of deadly force. *See Abdullahi v. City of Madison*, 423 F.3d 763, 769–71 (7th Cir. 2005) (pressure on chest and neck causing collapsed left lung is deadly force); *Philips v. Community Ins. Corp.*, 678 F.3d 513, 521 (7th Cir. 2012) (deadly force "must at least carry with it a substantial risk of causing death or serious bodily harm."); 720 ILCS 5/7-5.5(a), (c) ("A peace officer … shall not use a chokehold … unless deadly force is justified under this Article … chokehold means applying direct pressure to the throat, windpipe, or airway of another.").[15]

If a jury were to find that Pufpaf restricted Chalmers's airway while Chalmers was compliant and did not pose any threat to the officer, then it was clearly established that deadly force was not authorized. *See Taylor v. City of Milford*, 10

---

[15] Chalmers submits Chicago Police Department General Order G03-02-01 on use of force, which classifies a chokehold or pressure to the windpipe or airway as "deadly force" and prohibits the use of a chokehold to prevent the destruction of evidence or to prevent harm to the suspect. [59] ¶¶ 23–26; [59-1] at 6. Departmental policy is not indicative of whether force is excessive under the Constitution. *United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017). Department policies can be relevant to the inquiry, for example when they help a jury understand specialized techniques or equipment used by the police or when a party submits evidence of national or widely used policies. *See Brown*, 871 F.3d at 537–38. But the police department guidelines here are not about specialized techniques, nor does Chalmers submit information about larger trends in police departments' chokehold regulations. For that reason, I decline to consider the General Order at this stage of the litigation.

F.4th 800, 807 (7th Cir. 2022) ("A person has a right not to be seized through the use of deadly force unless he puts another person (including a police officer) in imminent danger or he is actively resisting arrest and the circumstances warrant that degree of force"); *Gant v. Hartman*, 924 F.3d 445, 451 (7th Cir. 2019) ("Our decisions show that it is unreasonable to use deadly force against a suspect who is not resisting arrest and who is genuinely attempting to surrender."). Other circuits have established that use of a chokehold or other restriction on the airway of a non-resisting person or restrained person violates the Fourth Amendment. *See Tuuamalemalo v. Greene*, 946 F.3d 471 (9th Cir. 2019); *Coley v. Lucas County*, 799 F.3d 530 (6th Cir. 2015); *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) (pressure on vulnerable person's upper torso while he was lying on his stomach is deadly force and unconstitutional); *United States v. Livoti*, 196 F.3d 322, 324–27 (2d Cir. 1999) (prosecution of former police officer for violation of decedent's civil rights, including using a chokehold); *see also Ingram v. Shipman-Meyer*, 241 F.Supp.3d 124, 139–146 (D.C. Dist. 2017) (collecting cases on chokeholds as a use of force).

If, on the other hand, a jury found that Pufpaf did not restrict Chalmers's airway and that Chalmers was neither subdued nor compliant, there is no case that establishes that a police officer cannot use less than deadly force to prevent ingestion of drugs, particularly when the arrestee is not responding to verbal commands. *See Pennington v. Terry*, 644 Fed. App'x 533, 544 (6th Cir. 2016) (no clearly established rule preventing use of taser on arrestee who was disobeying police orders and refusing to spit out pills); *Singleton*, 1 F.Supp.2d at 315 (Heimlich and pepper spray are

reasonable uses of force); *Love*, 2013 WL 159246 at *2 (taser and strikes to the mouth are reasonable).

There are too many disputes over material facts—was there time between Pufpaf giving a verbal command and using physical force on Chalmers, how much pressure was Pufpaf exerting on the front of Chalmers's neck, at what point did Chalmers start saying he had nothing, etc.—to determine whether Pufpaf used excessive force and if it was clearly established at the time that the force used was unconstitutional.

b. Punches and Knee Strikes

Because it is disputed whether Chalmers elbowed Pufpaf or otherwise acted to resist arrest, summary judgment is inappropriate on the excessive force claim regarding Pufpaf's punches to Chalmers's face and the knee strikes to the back. Taking the facts in the light most favorable to Chalmers—he was compliant with handcuffing, had been choked by the officers even though he told them he did not have any drugs, and then was taken to the ground, punched twice in the face, and kneed in the back. The video reflects that all three officers exerted some kind of force on Chalmers as he was lying prone on the ground. Depending on how it resolved the factual disputes, a jury could find that the officers used excessive force.

But based on the facts in the light most favorable to Pufpaf, a jury would not be required to find in favor of Chalmers. Pufpaf was responding to an arrestee who was not compliant with his order to spit out drugs, the arrestee stiffened his body and resisted having his right hand put into handcuffs, and then elbowed Pufpaf in the

21

neck and vest. An officer may reasonably increase the force he is using in proportion to the threat presented. *Phillips*, 678 F.3d at 527.

Both parties urge me to look at the video to resolve these issues of fact and enter judgment in their favor. But the video is not conclusive as to several important facts: (a) whether Chalmers was trying to flee the officers before he stopped on the corner of Karlov and Monroe, (b) whether Pufpaf gave verbal instructions to Chalmers *before* he placed his hands on his neck, (c) for how long and what pressure Pufpaf used on the front of Chalmers's neck, (d) whether Chalmers stiffened his body or tried to resist arrest while against the car or on the ground, (e) whether or not Chalmers elbowed Pufpaf, (f) whether the officers could see something in Chalmers's mouth (as they said on the video) so as to support their continued use force against him. The parties submit facts that are directly contrary to one another on these points, so to decide them, I would have to engage in the kind of credibility determinations that are inappropriate at summary judgment. *See Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021).

Qualified immunity is likewise inappropriate because the disputed facts directly implicate whether Pufpaf knew that punching Chalmers in the face and kneeing him in the back or leg violated Chalmers's constitutional right not to be subjected to force when Chalmers was compliant. It is clearly established that punching or kneeing someone who is not resisting or passively resisting is excessive. *Abbott*, 705 F.3d at 732; *Johnson v. Rogers*, 944 F.3d 966, 970 (7th Cir. 2019) (kick after suspect is in control would violate suspect's clearly established constitutional

rights). On the other hand, punches or knee strikes to subdue an arrestee who is stiffening their body and has elbowed an officer in the neck, is a reasonable use of force. *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020) ("the police may use significant force to subdue someone who is actively resisting lawful detention").

### 2. Pinching Chalmers's Nose

The same issues of material fact prevent resolution of the excessive force claim with regard to Officer Robles. Here, the most fundamental question—what force was used—is at issue. Robles denies touching Chalmers's nose. Chalmers testified that Robles pinched his nose shut. The video is inconclusive.

Qualified immunity also depends on the resolution of material facts. Assuming that Robles did pinch Chalmers's nose shut while Pufpaf was applying pressure to Chalmers's neck, the force exerted implicates the same concerns about restriction of airways as choking. As discussed above, the constitutionality of the officer's conduct, and whether the right to be free from that conduct was clearly established, depends on the force used. Until that factual dispute is resolved, the qualified-immunity question can't be answered.

### 3. Failure to Intervene

Issues of fact prevent an entry of judgment on the excessive force claim based on Robles and Schorsch's failure to intervene while Pufpaf punched and delivered knee strikes to Chalmers. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know … excessive force was being

used and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Stewardson v.* Biggs, 43 F.4th 732, 736 (7th Cir. 2022); *but see Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (concurring opinion). As discussed above, whether the officers used excessive force turns on whether Chalmers had ever or was continuing to resist arrest and whether Chalmers had committed a battery against Pufpaf. Furthermore, "whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Stewardson*, 43 F.4th at 736. Robles and Schorsch say that they did not see Pufpaf choking, kneeing, or striking Chalmers. [61] ¶¶ 34–35. Chalmers argues that they had to have seen and that they failed to intervene. [59] ¶¶ 13, 21. A jury would have to decide whether they are credible and whether they knew of, and had an opportunity to prevent, excessive force.

### B.     False Arrest

Probable cause is "an absolute defense to any § 1983 claim for false arrest." *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713–14 (7th Cir. 2013). "Probable cause exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id*. at 714; *accord Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015). An officer need not have probable cause as to the exact crime for which they arrest an individual. "So long as there is probable cause to believe that *some* criminal offense has been or is being

committed" then an arrest is authorized by the Fourth Amendment. *Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010); *Devenpeck v. Alford*, 543 U.S. 146, 153–56 (2004). A police officer is entitled to qualified immunity on a false-arrest claim when "a reasonable officer could have mistakenly believed that probable cause existed … as long as the officers reasonably, albeit possibly mistakenly, believed that probable cause existed to arrest, then they are entitled to qualified immunity." *Cibulka v. City of Madison*, 992 F.3d 633, 638 (7th Cir. 2021) (internal citations omitted).

Chalmers argues that there is an issue of fact regarding whether there was probable cause to arrest him because (1) the POD video does not show an exchange of drugs for money and (2) the surveillance team that watched the video and shared information with the officers have not testified or even been named. [52] at 9–10.[16]

The officers, in turn, call upon the "collective knowledge doctrine," which allows an arresting officer to rely on the knowledge of others in his agency to establish the facts in support of probable cause. *United States v. Eymann*, 962 F.3d 273, 283–84 (7th Cir. 2020). "For the collective knowledge doctrine to apply, (1) the officer taking action must act in objective reliance on the information received, (2) the officer providing the information—or the agency for which he works—must have facts

---

[16] Chalmers seems to argue that there is a dispute of fact about whether Chalmers sold drugs on August 3, 2020, because he says that he didn't sell drugs and no drugs were found on him or in his system. [52] at 9. But that is not the relevant inquiry because probable cause depends on "the facts and circumstances known to the officer at the time of the arrest." *Abbott*, 705 F.3d at 714. The focus, therefore, is on what the officers knew before they arrested Chalmers, not whether Chalmers did in fact sell drugs. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019) ("Where a reasonable person would have a sound reason to believe the suspect committed a crime, the police may arrest and allow the criminal justice system to determine guilt or innocence.").

25

supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010). Finally, if "officers are in communication with each other while working at a scene, their knowledge may be mutually imputed even when there is no express testimony that the specific or detailed information creating the justification for a stop was conveyed." *Torry*, 932 F.3d at 587 (internal citation omitted).

Some of the surveillance officers were watching the POD video, a copy of which is part of the record, and Pufpaf, Robles, and Schorsch testified at their depositions that the surveillance team gave them a description and location of the person who was suspected of selling drugs and that they relied upon that information when following and stopping Chalmers. [51] ¶¶ 6, 14–15, 22–24.

The POD video is attached to Officer Pufpaf's declaration and he provides the foundation for its admission. [37-6] ¶ 10. As described above, the video does not show Chalmers, or anyone, exchanging drugs for money. Instead, it shows one man in a white t-shirt and a lanyard around his neck approaching a group of three men on a corner. [40] (POD video at 20:36–21:02). The camera cuts out for a while and then focuses on two men, the one in a white t-shirt and a taller man in a dark t-shirt, walking close to one another. *Id.* at 21:30–35. Moments later, the camera picks up the two men walking away from one another; the man in the white t-shirt walks one way and the man in the black t-shirt walks back toward the corner where he had been previously. *Id.* at 21:35–45. The man in the black t-shirt handles a red-and-white

motorbike and is later shown riding it. *Id*. at 21:51–22:23; 25:51–25:59. The officers testified that they were conducting an operation in this area because it was an area known for drug deals. [51] ¶ 8.

Acting upon the information conveyed to them about the movements of the suspected buyer, Pufpaf, Robles, and Schorsch stopped an individual who looked like the shorter man in the video with a white t-shirt and a lanyard around his neck. [40] (Pufpaf BWC of suspected buyer at 08:56:32–09:03:30). He gave them substances that he understood to be drugs and that the officers suspected were drugs. [51] ¶ 21. Finally, the purchaser seems to confirm that he purchased the drugs from one of the three men on the corner. [40] (Pufpaf BWC of suspected buyer at 08:59:03–08:59:11).

When Pufpaf, Robles, and Schorsch begin pursuing the suspected seller, therefore, they knew that the surveillance officers saw an interaction they suspected of being a drug sale. They had received a description of the person suspected of selling drugs from the surveillance team—"They described the seller by his clothing description and the use of a, like small motorbike or dirt bike." [58-1] at 36:6–11; [51] ¶ 15. The officers received directions to the location of the suspected seller from the surveillance team. Officer Robles testified that the surveillance team directed them to the area of Springfield and Monroe: "So one of the sets of the officers directs you and your team to the location of the potential seller, right? Correct … to the area of Springfield and Monroe." [58-1] at 42:6–12; [51] ¶ 22. Officer Pufpaf testified that they were being directed by officers who were viewing the POD video. *See* [37-3] at

27

35:16–24.[17] Furthermore, the officers had interacted with the suspected buyer who had drugs and indicated that he had just purchased them from one of the three men on the corner. All of this is sufficient to support probable cause that Chalmers sold drugs to the man in the white t-shirt.

### C.    Conspiracy

A conspiracy under § 1983 requires an underlying constitutional violation and an agreement among the defendants to inflict the unconstitutional harm. *Green v. Howser*, 942 F.3d 772, 778 7th Cir. 2019). A § 1983 conspiracy claim is not an independent basis of liability. *Smith v.* Gomez, 550 F.3d 613, 617 (7th Cir. 2008). Instead, the conspiracy claim is a theory that spreads liability to additional persons. *Niehaus v. Liberio*, 973 F.2d 526, 532 (7th Cir. 1992). The only people who would be liable for conspiracy here are the same officers who are alleged to have committed the

---

[17] Chalmers relies on *Arnold v. City of Fort Wayne*, 210 F.Supp.3d 1055 (N.D. Ind. 2016), for the argument that officers cannot rely on the collective knowledge doctrine without identifying the surveillance officers who communicated with the officers who made the stop. *Id.* at 1062–1063. In *Arnold*, the officer who witnessed a traffic infraction and communicated that knowledge was never identified and the court held that the defendant officers were not entitled to summary judgment because "defendants have not established that the informing officer actually possessed sufficient information to justify the stop in the first place" *Id.* at 1063. While it is true that the name of the surveillance officers is not disclosed, here we have the POD video that the surveillance officers were watching that prompted them to direct the defendant officers to the suspected buyer. Here too the defendant officers testified that the surveillance officers communicated precisely the information that served as the basis for their stop of Chalmers—the suspected drug deal, the description of the suspected seller by his clothing, location, and use of a motorbike. [58-1] at 36:6–11; *cf. Arnold*, 210 F.Supp.3d at 1063 (nothing in the record indicates that one officer communicated basis for reasonable suspicion to second officer or how closely the officers were working together so as to impute knowledge). Finally, the officers had not only the information communicated to them by the surveillance team, but also the information they gleaned from their interaction with the suspected buyer—the existence of suspected drugs and the verbal confirmation that he had recently purchased them from three guys on a corner. [40] (Pufpaf BWC of suspected buyer at 08:59:03–08:59:11).

underlying constitutional violation—Pufpaf, Robles, and Schorsch. For that reason there is no reason for a separate claim. *See Ewell v. Toney*, 853 F.3d 911, 917–18 (7th Cir. 2017). If an instruction to the jury about conspiracy as a way to prove liability is appropriate at trial, such an argument should be made and considered at that time.

### D. Intentional Infliction of Emotional Distress

Under Illinois law, intentional infliction of emotional distress has three elements: (a) truly extreme and outrageous conduct by defendant; (b) defendant either intends that his conduct inflict severe emotional distress or knows that there is a high probability that his conduct will cause severe emotional distress; (c) the conduct must in fact cause severe emotional distress. *See Feltmeier v. Feltmeier*, 207 Ill.2d 263, 269 (2003) (internal citations omitted). "The law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *McGrath v. Fahey*, 126 Ill.2d 78, 86 (1988) (citation omitted) ("person" substituted for "man"). Chalmers has not provided any evidence of emotional distress and summary judgment is appropriate for defendants on this claim.

There are two mentions of emotional injuries in the record—the allegations in the complaint that Chalmers suffered "severe emotional distress" and Chalmers's response to paragraph 60 of defendants' Local Rule 56.1 statement of fact, in which he states that he claims emotional injuries, but fails to elaborate. [1] ¶¶ 25, 40, 47; [51] ¶ 60. This is insufficient evidence for a reasonable jury to find that Chalmers suffered severe emotional distress. At summary judgment, "a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). There is

nothing in the record from Chalmers averring that he was frightened, depressed, angry or that he could not sleep, suffered from anxiety, or had to see a doctor or therapist. *See Honaker v. Smith*, 256 F.3d 477, 496 (7th Cir. 2001) (describing evidence of emotional distress accepted by Illinois courts). The degree of extreme and outrageous conduct can sometimes be itself evidence that emotional distress occurred—where the conduct is more outrageous, less evidence of distress needs to be submitted. *See Honaker*, 256 F.3d at 497. But here there is no evidence of emotional distress other than the allegation in Chalmers's complaint. Chalmers has not created an issue of fact on a necessary element for his claim of intentional infliction of distress, so summary judgment is appropriate for defendants on the claim.

### E.  Malicious Prosecution

Malicious prosecution requires a plaintiff to show: (1) the commencement or continuation of an original criminal or civil proceeding by defendants, (2) termination of the proceeding in favor of plaintiff, (3) the absence of probable cause for the proceeding, (4) the presence of malice, and (5) damages resulting to plaintiff. *Swick v. Liautaud*, 169 Ill.2d 504, 512 (1996); *Ross v. Mauro Chevrolet*, 369 Ill.App.3d 794, 801 (1st Dist. 2006).[18] Because Chalmers cannot show that the proceedings were

---

[18] Chalmers is correct that the probable cause standard that bars a false arrest claim is different than that which defeats a malicious prosecution claim. [10] at 13. A plaintiff bringing a malicious prosecution claim must show a lack of probable cause as to each charge prosecuted; conversely, a showing of probable cause for any particular charge only defeats the malicious prosecution claim for that charge. *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007). However, because Chalmers cannot show that any of the charges were terminated in a favorable manner according to the Illinois standard, his claim of malicious prosecution fails.

terminated in his favor according to the standard established by Illinois law, summary judgment for the defendants is granted as to this count.

In Illinois, when a criminal proceeding has been terminated by a *nolle prosequi* order, the plaintiff must show that the "circumstances surrounding the abandonment of the criminal proceedings [ ] compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution." *Swick v. Liautaud*, 169 Ill.2d at 513–14; *accord Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 109. Further, "bare use of a *nolle prosequi* order, which does not state its reasons for entry, does not establish that the criminal proceedings were terminated in a manner consistent with [the plaintiff's] innocence." *Swick*, 169 Ill.2d at 514; *see also Lund v. City of Rockford, Illinois*, 956 F.3d 938, 949 (7th Cir. 2020).

The uncontested facts here are that the five counts against Chalmers were dropped due to a *nolle prosequi* order on August 19, 2023. [51] ¶ 63. The order itself only says: "C01, C02, C03, C04, C05, Nolle Prosequi." [37-10]. Defendants submitted the transcript of the hearing at which that order was entered. [37-11]. Without any discussion of the reason why, the prosecutor states he is going to motion to "nolle pros," which is seemingly accepted by the judge who repeats "Motion state nolle pros Edward Chalmers." [37-11] at 2:5–9. The proceeding then ends. *Id.*[19]

---

[19] Defendants offer evidence that Chalmers's wife attended the August 19, 2023 criminal court date and told Chalmers that the criminal charges were dropped because the officers did not show up to court. [51] ¶ 64; [37-2] 87:14–88:5. If offered for the truth of the matter, i.e., the charges were dropped because the officers did not show up, this is inadmissible hearsay. Fed. R. Evid. 801(c). Regardless, a dismissal because the officers did not show up is not sufficient to show that the case was dropped for reasons related to innocence. *See Armstrong v. Village of Bellwood*, No. 18-5919, 2021 WL 148802 at *8 (N.D. Ill. 15, 2021).

Chalmers has not provided any other evidence regarding the circumstances in which the *nolle prosequi* order was entered. Instead, he argues that the video evidence and deposition testimony of the defendants, which in his view clearly show that he did not resist arrest nor batter anyone nor possess any narcotics, could allow a jury to infer that the State did not proceed with the prosecution in light of the evidence. [52] at 13–14. This is insufficient at summary judgment to show that the cases were terminated *because* "there existed a lack of reasonable grounds to pursue the criminal prosecution." *Swick* at 514; *see also*, *Lund*, 956 F.3d at 949 ("Coincidence in timing on top of a bare use of the *nolle prosequi* order does not constitute the sort of proof which might compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution.").

Courts have looked for additional affirmative evidence that the dismissal was for reasons indicative of innocence to find that a plaintiff has created an issue of fact regarding favorable termination in malicious prosecution claims. *See Washington v. Summerville*, 127 F.3d 552, 558 (7th Cir. 1997) ("Lack of a recorded reason for the nolle prosequi offers no insight as to the validity or invalidity" of the proposition that the case was terminated in plaintiff's favor.); *see also Walker v. White*, No. 16-7024, 2021 WL 1058096, *13 (N.D. Ill. Mar. 19, 2021) (Certificate of innocence is enough to create a factual dispute about whether his case was terminated in a manner indicative of his innocence); *Brown v. City of Chicago*, No. 18-7064, 2022 WL 4602714 at **31–33 (N.D. Ill. Sep. 30, 2022) (*nolle prosequi* order and deposition testimony from Cook County State's Attorneys about why they dropped the case and certificate

of innocence created issues of fact about whether criminal charge was terminated in plaintiff's favor). Chalmers has failed to offer sufficient evidence to show that the prosecution was terminated in his favor under the Illinois standard for that element. Judgment is appropriate for defendants on this claim.

### F.    Battery

Both sides also move for judgment on Chalmers's battery claim. Chalmers argues that he has proved facts that satisfy the elements of battery—an intentional act and resulting contact with plaintiff's person. [36] at 10; [52] at 15; [60] at 12–13. The officers argue that their contact with Chalmers was legally justified, and that they are protected by state tort immunity because Chalmers has not shown that the officer's behavior was "willful and wanton." [45] at 15; [38] at 15. The Illinois Tort Immunity Act gives immunity to public employees engaged "in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. "Willful and wanton" is defined by the statute as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210.

Chalmers does not engage with the issue of whether the officers' behavior was willful and wanton; instead he focuses on whether the officers' behavior met the constitutional standard. [36] at 10–11; [52] at 14–15; [60] at 12–13. The officers argue that if the officers' behavior was objectively reasonable then it cannot be willful and wanton, [38] at 15, but they also argue that willful and wanton "is a more stringent standard than the objective reasonableness standard" and would preclude liability on

battery even if the officers' behavior violated the Fourth Amendment. [45] at 14. Chalmers fails to respond to this latter argument and makes no arguments about what facts would support a finding that the officers' behavior was willful and wanton. *See* [60] at 12–13. Behavior that violates the Fourth Amendment can fail to be "willful and wanton." *See Carter v. Chicago Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998). Because Chalmers failed to respond to the willful-and-wanton issue, he has forfeited it. *See Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) ("Forfeiture is the mere failure to raise a timely argument"). There is no contested issue and judgment is appropriate for defendants on the battery claim.

### G.   Indemnification

Because there are disputed issues of material fact that prohibit the resolution of Chalmers's claims for excessive force, the indemnification claim remains pending. *See* 745 ILCS 10/9-102.

## IV.   Conclusion

Plaintiff's motion for partial summary judgment [33] is denied. Defendants' motion for summary judgment [34] is granted in part, denied in part. Summary judgment is entered for the defendants on the § 1983 claims of false arrest and conspiracy, and the state-law claims of intentional infliction of emotional distress,

malicious prosecution, and battery. Disputes over material facts preclude judgment on the § 1983 excessive-force claim and the state-law indemnification claim.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  March 16, 2023

35